# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 11, 2017        Decided August 4, 2017

Reissued September 29, 2017

No. 15-5332

AMERICAN WILD HORSE PRESERVATION CAMPAIGN, ET AL.,
APPELLANTS

v.

SONNY PERDUE, SECRETARY, U.S. DEPARTMENT OF
AGRICULTURE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00485)

———

*David Zaft* argued the cause for appellants. With him on the briefs was *William S. Eubanks II*. *Katherine A. Meyer* entered an appearance.

*Mark R. Haag*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *John C. Cruden*, Assistant Attorney General at the time the brief was filed, *Meredith L. Flax* and *Stuart Gillespie*, Attorneys, U.S. Department of Justice, and *Steven F. Hirsch*, Attorney-Advisor, U.S. Department of Agriculture.

*Caroline Lobdell* was on the brief for defendants-intervenors-appellees.

Before: TATEL, MILLETT, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Since 1975, the United States Forest Service has protected and managed wild horses in the Devil's Garden section of the Modoc National Forest in Northern California. That wild horse territory originally consisted of two separate tracts of land of roughly 236,000 acres. But at some point in the 1980s, a Forest Service map added in an approximately 23,000 acre tract of land known as the Middle Section and, in so doing, linked the two territories into a larger and unified wild horse territory of approximately 258,000 acres. For more than two decades, the Service continued to describe the territory as a single contiguous area and to manage wild horses in the Middle Section.

In 2013, the Forest Service publicly acknowledged the cartographic confusion, declared the expansion reflected in the 1980s map to be an administrative error, and without further analysis redrew the wild horse territory's lines to exclude the Middle Section and to revert to two disjoined tracts of land. The American Wild Horse Preservation Campaign and other plaintiffs filed suit alleging that the Service's revamping of the territorial lines violated numerous federal laws. We agree. A 23,000 acre tract of land and two decades of agency management cannot be swept under the rug as a mere administrative mistake. We accordingly reverse in part, vacate in part, and direct the district court to remand to the Service to address rather than to ignore the relevant history.

**I**

The Modoc National Forest comprises approximately 1.6 million acres of federally managed land in Northern California. Included within the Forest are several hundred thousand acres of protected wild horse land that make up the Devil's Garden Wild Horse Territory. The Forest Service's management of the Devil's Garden Wild Horse Territory is subject to a Matryoshka doll of nesting federal statutes.

*First*, the Wild and Free-Roaming Horses and Burros Act of 1971 ("Wild Horses Act"), 16 U.S.C. § 1331 *et seq.*, charges the Secretaries of Interior and Agriculture with "protect[ing] and manag[ing] wild free-roaming horses and burros" on federal lands, *id.* § 1333(a). The Secretaries "may designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation," and "shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance[.]" *Id.* The Secretaries also "shall maintain a current inventory" and set "appropriate management levels" for "wild free-roaming horses and burros," to ensure a "thriving natural ecological balance" and to "protect the range from the deterioration associated with overpopulation." *Id.* § 1333(b)(1), (2). Wild horses are to be treated "in the area where presently found" as an integral component "of the natural system of the public lands." *Id.* § 1331.

The Service is responsible for implementing the Wild Horses Act within the National Forest System. 36 C.F.R. § 222.60(a). In 1980, the Service promulgated regulations providing that it "shall: * * * [e]stablish wild horse and burro territories" ("Wild Horse Territories"), and then "[a]nalyze," "develop[,] and implement a management plan" for each Wild Horse Territory. *Id.* § 222.61(a)(3)–(4). The Service may

"update[]" the Wild Horse Territory Plans "whenever needed, as determined by conditions on each territory." *Id.* § 222.61(a)(4). The Service must also "[m]aintain a current inventory of [wild horses] on each [Wild Horse Territory] to determine * * * where excess animals exist[,]" *id.* § 222.61(a)(5), set "appropriate management levels" for those horses and burros, and "remov[e] or destr[oy] * * * excess animals," *id.* § 222.61(a)(6); *see also id.* § 222.69.

Service regulations further define "[w]ild free-roaming horses and burros" to mean "all unbranded and unclaimed horses and burros and their progeny that" either "have used lands of the National Forest System on or after December 15, 1971," or that "do hereafter use these lands as all or part of their habitat." 36 C.F.R. § 222.60(b)(13). Those animals retain federal protection even if they "move to lands of other ownership or jurisdiction as a part of their annual territorial habitat pattern or for other reasons." *Id.* § 222.65.

*Second*, the National Forest Management Act of 1976 ("Forest Management Act"), 16 U.S.C. § 1600 *et seq.*, "requires the Secretary of Agriculture to 'develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System.'" *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 728 (1998) (quoting 16 U.S.C. § 1604(a)). The Secretary has delegated his authority under the Act to the Service. 36 C.F.R. § 200.3(b).

The Forest Management Act establishes a two-step procedure for managing National Forest System lands. The Service must (i) "develop, maintain, and, as appropriate, revise land and resource management plans" for national forests ("Forest Plans"), and (ii) ensure that all "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands," including Wild

Horse Territory Plans, are "consistent with the [Forest Plans]." 16 U.S.C. § 1604(a), (i).

The Forest Management Act sets out several general conditions with which the development of Forest Plans must comply. *See* 16 U.S.C. § 1604(f). For instance, the Service must "provide for public participation in the development, review, and revision of [Forest Plans]." *Id.* § 1604(d). In addition, the Plans must "be embodied in appropriate written material, including maps and other descriptive documents," *id.* § 1604(f)(2), and "be prepared by an interdisciplinary team," *id.* § 1604(f)(3). The Forest Service may amend Forest Plans "in any manner whatsoever after final adoption[.]" *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 227 (D.C. Cir. 2009) (quoting 16 U.S.C. § 1604(f)(4)); *see also* 36 C.F.R. § 219.13(a). But if an "amendment" of a Forest Plan "would result in a significant change," the amendment process must comply with heightened procedural requirements. *See* 16 U.S.C. § 1604(f)(4). Regardless of whether an amendment is significant, however, the Forest Service must allow for public participation in the amendment process. *Id.*

Service regulations elaborate upon the procedures for developing and amending Forest Plans. 36 C.F.R. §§ 219.1–219.19. As relevant here, the Service must develop Forest Plans in coordination with the statutorily required interdisciplinary team, extensive public participation and comment, and related efforts of other federal agencies, state and local governments, and Indian tribes. *Id.* §§ 219.4, 219.5. Formulation of such Plans must take into consideration, *inter alia*, "fish and wildlife species," "grazing and rangelands," "habitat and habitat connectivity," "[h]abitat conditions," and "[l]and status and ownership, use, and access patterns relevant to the [Forest Plan] area." *Id.* § 219.10(a). The Plan must also "maintain the diversity of plant and animal communities"

within the forest.  *Id.* § 219.9.

*Third*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, obligates federal agencies to analyze the environmental consequences of proposed federal actions. *See generally id.* § 4332.  Under NEPA, federal agencies must conduct an Environmental Assessment to determine whether a proposed federal action will have a significant effect on the environment.  40 C.F.R. §§ 1508.9(a), 1508.13.  If that Assessment indicates that the environmental impacts will not be significant, the agency must issue a "finding of no significant impact," *id.* § 1501.4(e), explaining why the agency action will not substantially affect the environment, *id.* § 1508.13.  But if the Assessment indicates that the proposed action will "significantly affect[] the quality of the human environment," the agency must prepare an Environmental Impact Statement detailing:  "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of [the] environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."  42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1502.2.

*Fourth*, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, prohibits arbitrary and capricious actions by federal agencies and mandates that they give reasoned explanation for the actions that they do take.  *See*, *e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–52 (1983); *see also Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be

arbitrary or capricious includes a requirement that the agency adequately explain its result[.]”).

## II

While this dispute concerns a 2013 decision by the Service to change the boundaries of the Devil's Garden Wild Horse Territory, the origins of the controversy reach back four decades.

## A

In 1975, the Service issued its first Devil's Garden Wild Horse Territory Plan. The Wild Horse Territory specified in that plan consisted of two separate areas of land totaling approximately 236,000 acres. The Territory did not include a parcel of land of approximately 23,000 acres, known as the Middle Section, which conjoined those two separate tracts.

Sometime in the 1980s, a Forest Service map depicted the Devil's Garden Wild Horse Territory as a single contiguous area of land that included the Middle Section. According to the Service, the map's "revised boundary" "incorporated about another 23,631 acres of land," resulting in a Wild Horse Territory of "approximately 258,000 acres in size." J.A. 261.

Then, in 1991, the Service issued a Forest Plan for the Modoc National Forest. While the Plan did not include a map of the Wild Horse Territory, the Forest Plan acknowledged that the Service "is legally obligated to manage horses within a 258,000-acre wild horse territory," J.A. 584, and announced that "[t]he Forest has one wild horse territory of about 258,000 acres," J.A. 585.

The 1991 Forest Plan also stated that the Service "prepared the Wild Horse [Territory] Plan in 1985, which identifies a

population objective of 275–335 animals to manage."  J.A. 585–586.[1]  The interdisciplinary team that prepared the 1991 Forest Plan expressly denominated the "Wild Horse [Territory] Plan" to be "consistent with, and still appropriate for, the [1991] Forest Plan."  J.A. 578.  As a result, the Wild Horse Territory Plan, which the interdisciplinary team understood to include a single 258,000 acre territory, was expressly "incorporated by reference" into the 1991 Forest Plan.  J.A. 578; *see also* J.A. 588 (describing "Wild Horse [Territory] Plan" as an "[e]xisting [p]lan[] [r]etained and [i]ncorporated by [r]eference into the [1991] Forest Plan and *[u]pdated to be [c]onsistent*") (emphasis added).  When the 1991 Forest Plan was finally approved, it "supersede[d] most previous Forest resource management plans."  J.A. 578.

Over the next two decades, the Service actively managed and recorded wild horses in the Middle Section, as evidenced by official Wild Horse Inventory Reports from that time period.

**B**

The Modoc National Forest is divided into grazing "allotments."  Generally speaking, the Wild Horse Territory boundaries do not hew precisely to those of the grazing allotments.  Rather, the Wild Horse Territory covers portions of various allotments.  The disputed Middle Section consists of portions of five allotments:  the Triangle, Avanzino, Carr, Timbered Mountain, and Big Sage Allotments.  In 1971, when the Wild Horses Act was adopted, two portions of allotments in the Middle Section were privately held:  the Triangle portion, and the Avanzino portion.  In total, those private lands covered approximately 5,923 acres.  The other portions—the Carr, Timbered Mountain, and Big Sage portions—were

---

[1] The Service denies that there was a 1985 Wild Horse Territory Plan.

publicly held in 1971. Consequently, as stipulated by the Service, the "majority of the lands in the [Middle Section] were publicly held in 1971[.]" J.A. 66.

In 1976, the Service acquired the Triangle Allotment as public land. That means that, in 1991, when the Service adopted the Forest Plan that included the Middle Section in the Wild Horse Territory, only one portion of the Middle Section was privately held: the Avanzino portion. That private land covered approximately 10% of the Middle Section's acreage.

## C

In July 2011, the Service issued a scoping letter proposing to update the Devil's Garden Wild Horse Territory Plan. That letter indicated that the Wild Horse Territory was "approximately 268,750 acres in size," J.A. 757, and included a map depicting the Wild Horse Territory as a single, contiguous area of land including the Middle Section.

A year later, the Service turned its attention to the discrepancy between the Wild Horse Territory boundaries in the 1991 Forest Plan and the boundaries in the original 1975 Wild Horse Territory Plan. The Forest Service issued a new scoping letter in December 2012 stating that, "[d]uring the mid-1980's, the [Modoc National Forest's Devil's Garden and Doublehead Ranger Districts] appear[] to have adjusted the [Wild Horse Territory] boundary for administrative convenience" to "incorporate[] about [an additional] 23,631 acres of land." J.A. 731. The December 2012 scoping letter called this an "administrative error" and "propose[d] to return to the management of wild horses within the [Wild Horse Territory] boundary established in 1975." J.A. 732.

In August 2013, the Service released a Final Environmental Assessment to accompany its proposed

revisions to the size of the Wild Horse Territory. Like the scoping letter, the Final Environmental Assessment labeled the inclusion of the Middle Section "[a]n administrative error," J.A. 264, 708, and "propose[d] to return to the management of wild horses within the [Wild Horse Territory] boundary" as originally established, J.A. 264, 710. The Service also issued a Decision Notice and Finding of No Significant Impact, incorporating the Final Environmental Assessment by reference. That Decision formally adopted the proposed action set forth in the Final Environmental Assessment and concluded that contracting the Wild Horse Territory as proposed would not have a sufficiently significant environmental impact to necessitate an Environmental Impact Statement.

Also in August 2013, the Service issued its new Devil's Garden Wild Horse Territory Plan. The 2013 Wild Horse Territory Plan indicated that the boundaries of the Wild Horse Territory would mirror those of the 1975 Wild Horse Territory Plan, which did not include the disputed Middle Section.

**D**

After exhausting their administrative remedies, plaintiffs, the American Wild Horse Preservation Campaign, Return to Freedom, and Carla Bowers (collectively, "Campaign"), all of which advocate for the protection of wild horses, filed suit in the United States District Court for the District of Columbia. They contend that the Service's 2013 revision of the Devil's Garden Wild Horse Territory violated the Administrative Procedure Act, the Wild Horses Act, the Forest Management Act, and NEPA. *See American Wild Horse Preservation*

*Campaign v. Vilsack*, No. 14-0485, Docket Entry No. 1 (D.D.C. Mar. 24, 2014) (Compl. ¶¶ 58–91).[2]

On September 30, 2015, the district court granted summary judgment for the Service. *American Wild Horse Preservation Campaign v. Vilsack*, 133 F. Supp. 3d 200 (D.D.C. 2015). The court concluded that the Service permissibly found that the Middle Section was never incorporated into the Wild Horse Territory, and that any reference to a single, contiguous Wild Horse Territory was a mere "administrative error." *Id.* at 212; *see also id.* at 212–218. The district court also ruled that the Service's redrawing of the boundaries of the Wild Horse Territory did not amount to a "significant" amendment warranting formal procedures under the Forest Management Act, as the Service was already managing the Wild Horse Territory as two noncontiguous units. *Id.* at 219–220. The district court similarly reasoned that, because the Service's "boundary adjustment simply corrected an administrative error and resulted in the continued management of the [Middle Section] as distinct from the [Wild Horse Territory]," the Service reasonably determined that its boundary correction would not significantly affect the quality of the human environment, within the meaning of NEPA. *Id.* at 221.

## III

We review the district court's grant of summary judgment *de novo*. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011). Under the Administrative Procedure Act, we must set aside the Service's actions if they are "arbitrary, capricious, an abuse of discretion, or otherwise

---

[2] The Campaign also originally challenged the management level for horses set by the Service, but does not press that issue on appeal.

not in accordance with law." 5 U.S.C. § 706(2)(A). That standard obligates the agency to examine all relevant factors and record evidence, and to articulate a reasoned explanation for its decision. *See State Farm*, 463 U.S. at 52. Generally, a rule is arbitrary and capricious if the agency: "(1) 'has relied on factors which Congress has not intended it to consider,' (2) 'entirely failed to consider an important aspect of the problem,' (3) 'offered an explanation for its decision that runs counter to the evidence before the agency,' or (4) [offers an explanation that] 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *United States Sugar Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016) (quoting *State Farm*, 463 U.S. at 43).

We hold that the Service's decision to eliminate the Middle Section of the Devil's Garden Wild Horse Territory Plan was arbitrary and capricious in two respects. First, the Service failed to acknowledge and adequately explain its change in policy regarding the management of wild horses in the Middle Section as part of a single, contiguous protected Wild Horse Territory. Second, the Service failed to consider adequately whether an Environmental Impact Statement was required under NEPA. Accordingly, we reverse the district court's grant of summary judgment for the Service.

**A**

A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice[.]'") (second alteration

in original) (quoting *National Cable & Telecomms. Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)); *Lone Mountain Processing, Inc. v. Secretary of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.  Failing to supply such analysis renders the agency's action arbitrary and capricious.") (internal quotation marks and citation omitted); *United Mun. Distribs. Grp. v. FERC*, 732 F.2d 202, 210 (D.C. Cir. 1984) ("[A]gencies must give a reasoned analysis for departures from prior agency practice[.]") (citing *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).[3]

For that reason, we have long held that "[a]n agency may not * * * depart from a prior policy *sub silentio*[.]"  *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 707 (D.C. Cir. 2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *Verizon v. FCC*, 740 F.3d 623, 636 (D.C. Cir. 2014) (same); *Comcast Corp. v. FCC*, 600 F.3d 642, 659 (D.C. Cir. 2010) (same).

---

[3]  *See also Mistick PBT v. Chao*, 440 F.3d 503, 512 (D.C. Cir. 2006) ("Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious.") (quoting *Ramaprakash v. FAA*, 346 F.3d 1121, 1130 (D.C. Cir. 2003)); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1296 (D.C. Cir. 2004) ("If an agency decides to change course * * * we require it to supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.") (internal quotation marks and citation omitted); *National Classification Comm. v. United States*, 779 F.2d 687, 696 (D.C. Cir. 1985) ("[A]n agency may depart from past policies or practices *if* the agency also provides a reasoned explanation for its actions.") (emphasis added).

The Service's main defense in this case, however, has been to insist that nothing changed in 2013.  In the Service's view, the Middle Section was never part of the Devil's Garden Wild Horse Territory, and so there was nothing to change.  That argument flatly defies the plain text of the official 1991 Forest Plan, repeated official agency statements, and two decades of agency practice.  Blinders may work for horses, but they are no good for administrative agencies.

The Service argues secondly that the inclusion of the Middle Section must be ignored because it lacked the legal authority to add it in the mid-1980s.  That argument never even leaves the starting gate.

**1**

The Service tries to shrug off its inclusion of the Middle Section in the Wild Horse Territory as some sort of inconsequential and passing "administrative error," as though that label nullifies any agency duty to reasonably explain its about-face.  But there is no "oops" exception to the duty of federal agencies to engage in reasoned decisionmaking. Accordingly, the Service's decision runs aground on both the facts and the law.

As a matter of factual reality, this case involves far more than an errant map.  The Service's inclusion of the Middle Section in the Wild Horse Territory is well documented in the administrative record, and it was reconfirmed repeatedly by two decades of agency practice and official pronouncements.

Most significantly, the official 1991 Forest Plan formally documented that the Modoc National Forest "has one wild horse territory of about 258,000 acres," J.A. 585, and that the Service "is legally obligated to manage horses within [that] 258,000-acre wild horse territory," J.A. 584.  That language

was no divagation. The Forest Plan was the product of more than ten years of formal study by the Service involving participation by: (i) hundreds of members of the public who submitted numerous comments and gave 105 testimonials at almost 50 public meetings, (ii) five other federal government agencies, (iii) eleven state agencies, (iv) various local governments, agencies, and elected officials; (v) four tribal communities, and (vi) various industry and non-profit groups. Such extensive study and wide participation renders fanciful the notion that 23,000 acres of wild horse territory simply slipped in unnoticed.

The Service notes that the record contains no affirmative indications that the Service "intended to expand the boundaries of the existing Territory when it adopted the [1991] Forest Plan." Service's Br. 16. True. But that is because the Forest Plan treated the determination of the Wild Horse Territory's size as a decision that had already been made in an earlier Service plan. *See* J.A. 585–586 ("The [Modoc National] Forest has one wild horse territory of about 258,000 acres * * * * Fulfilling requirements of the [Wild Horse] Act the [Service] prepared the Wild Horse Management Plan in 1985[.]"). To be sure, the Service denies that there was such a 1985 plan. Service's Br. 15 n.7. But that misses the point: The 1991 Forest Plan that the Service drafted, and in the formulation of which it was the key player, described the Wild Horse Territory's expanded 258,000 acreage as a *fait accompli* by 1991. So the absence of expansion talk in the Forest Plan is no surprise.

What the 1991 Forest Plan did do was formally document a single, contiguous, 258,000 acre Wild Horse Territory that could only exist through inclusion of the Middle Section, incorporate that status into the Plan through a notice-and-comment process, and set a herd management level within that

territory of "275–335 animals to manage," J.A. 586. In addition, the Forest Plan's explicit description of the size and management levels for the Wild Horse Territory largely repudiates the Service's claims that the plan was "of no practical consequence for the management of the disputed area because the Forest Service never set appropriate management levels for horses on the [portions of allotments] within the disputed area." Service's Br. 44.

The Service also argues that it did not intend to expand the territory. But after-the-fact claims about agency intentions do not work when agency actions evince the opposite. And the Service's actions for at least twenty years corroborated the Middle Section's inclusion in the Wild Horse Territory.

More specifically, Wild Horse Inventory Reports for the Devil's Garden Wild Horse Territory documented the Service's treatment of portions of the Middle Section as part of the Territory after the 1991 Forest Plan. In 1992 and 1993, the Wild Horse Inventory Reports counted the "total [number of] horses[,] mules & burros" in ten regions within the Modoc National Forest. J.A. 859, 861. Big Sage, which is partially contained within the Middle Section, and Boles Meadow, which is entirely within the Middle Section, were both excluded from the original 1975 Wild Horse Territory boundaries. But they are listed as two of the ten main regions that Service observers surveyed for wild horses in 1992 and 1993. The 1992 Wild Horse Inventory Report documented 33 horses in Big Sage and Boles Meadow combined—more than ten percent of the total headcount of 321 horses for the entire Wild Horse Territory. The 1993 Wild Horse Inventory Report documented five horses in Big Sage and Boles Meadow combined, out of 58 horses in total.

In addition, statements accompanying the 1992 and 1993 Wild Horse Inventory Reports implicitly treated Big Sage and Boles Meadow as within the Wild Horse Territory. For example, in the 1992 Wild Horse Inventory Report, the Service noted that some of the wild horses spotted were located outside the Wild Horse Territory. *See, e.g.*, J.A. 862 (1992 Wild Horse Inventory Report: "Ten horses were observed in the West Grizzlie * * * Allotment. This area is outside of the wild horse territory. Every effort should be made to return these animals to the territory and/or [have them] removed."). By implication, the remaining wild horses that the Service counted—including those wild horses in Big Sage and Boles Meadow—were considered to be inside the Wild Horse Territory. Moreover, the 1993 Wild Horse Inventory Report recommended that certain wild horses found outside the Wild Horse Territory be relocated to Boles Meadow. J.A. 860 (1993 Wild Horse Inventory Report: "There are 3 [wild horses] in the Blue Mtn. Allotment that need to be *relocated to the Boles [Meadow]. The Blue Mtn. Allotment is outside of the Territory.*") (emphasis added). That has to mean that the Service considered Boles Meadow (in the Middle Section) to be within the Wild Horse Territory. Why else would the Service devote scarce resources to shuffling horses from one location outside the Territory to another one also outside the Territory?

Starting in 1994, the Wild Horse Inventory Reports began not only reporting the number of wild horses identified in specific areas, but also listing "designated management herd minimum size[s]" (which appear to be analogous to what the Service now terms "appropriate management levels") for each region. Those post-1994 reports continued to treat portions of the Middle Section as part of the Wild Horse Territory by designating a management herd minimum size for "Big Sage" and "Boles [Meadow]." J.A. 857.

All subsequent Wild Horse Inventory Reports in the record—for the years 1996, 1997, 1998, 2002, 2004, and 2010—also established "designated management herd minimum sizes" for Big Sage and Boles Meadow. *See, e.g.*, J.A. 851.[4] On top of that, the 2002 and 2010 Wild Horse Inventory Reports listed "Avanzino"—also contained in the Middle Section—as one of the regions surveyed.

The pattern continues in the post-1994 Wild Horse Inventory Reports. For instance, the 1998 Wild Horse Territory Report recommended the relocation of wild horses found in Boles Meadow. *See* J.A. 852 (1998 Wild Horse Inventory Report: "Our plans in 1999 are to capture and relocate 100 adult horses on the Emigrant Spring, *Boles*, Pine Springs, [and] Surveyor's Valley allotments.") (emphasis added). Other Wild Horse Inventory Reports recommended that wild horses found outside the Wild Horse Territory be relocated *to* Boles Meadow. *See, e.g.*, J.A. 856 (1996 Wild Horse Inventory Report: "Horse sign has been observed in the Garden Tank and Lower Fletcher Creek areas. Th[ese] area[s] [are] outside of the Wild Horse Territory and these horses should be moved back over to the Timbered Ridge Area (*Boles [Meadow]*).") (emphasis added); J.A. 858 (same for 1994 Wild Horse Inventory Report).

Further, the 1997 Wild Horse Inventory Report inventoried 289 wild horses in total, but noted that 40 of those wild horses were found in the "Mtn. Dome Area," which was "outside * * * the * * * Devil's Garden Wild [H]orse Territor[y]." J.A. 854. The remaining 249 wild horses—including 17 wild horses in Big Sage and 36 wild horses in

---

[4] If, as it appears, "designated management heard minimum sizes" are synonymous with "appropriate management levels," the presence of those figures contradicts the Service's claim that levels were never set.

Boles Meadow—were deemed to be "within the territory." *Compare* J.A. 853 (inventory chart), *with* J.A. 854 ("Actual horses counted were 249 head within the territory."). Similarly, in the 2002 Wild Horse Inventory Report, the Service stated that the "[a]ctual horses counted were 500 head *within the wild horse territory*." J.A. 850 (emphasis added). The inventory report shows that this 500 figure included 88 wild horses in Big Sage, 11 wild horses in Avanzino, and 64 wild horses in Boles Meadow. J.A. 850. Further, to reduce this 500 figure, the Service planned "to capture and adopt 160 adult horses on the Emigrant Spring, Big Sage, and Avanzino allotments." J.A. 850. And "additional * * * horses [would] need to be removed *to be compliant with the Devil's Garden [Wild Horse Territory Plan]*." J.A. 850 (emphasis added).[5]

The Service does not deny what the Inventory Reports say or their treatment of wild horses in the Middle Section. Instead, the Service says we should pay no mind to those reports because those horses were "included solely for administrative convenience." Service's Br. 36–37. For that proposition, the Service points to a 2014 e-mail from a retired Service employee who purportedly was responsible for creating the 1980s-era Service map that first depicted the single, contiguous Wild Horse Territory. The email states that the retired employee "assigned Administrative [Appropriate Management Levels] to the Grazing Allotments for ease of managing the existing horses & the areas they were inhabiting." J.A. 767 (emphasis omitted). The email further states that "[t]he Administrative

---

[5] The Wild Horse Inventory Reports also consistently surveyed, and set appropriate management levels for, wild horses in the Timbered Mountain Allotment. Most of the Timbered Mountain Allotment is part of the original two-part Wild Horse Territory, but part of it is in the Middle Section. The pasture within the Timbered Mountain Allotment that is most heavily used by wild horses includes area within the Middle Section.

map & [Appropriate Management Levels] were never intended to change the [Wild Horse Territory] Plan," and were only made "for ease of managing the existing situation within the [Wild Horse Territory]." J.A. 767.

That email is at best a *post hoc* rationalization that was not part of the record before the Service when it issued its 2013 decision, and thus cannot help the Service here. *See District Hosp. Partners v. Burwell*, 786 F.3d 46, 55 (D.C. Cir. 2015) ("To ensure that we review only those documents that were before the agency, we do not allow parties to supplement the record unless they can demonstrate unusual circumstances justifying a departure from this general rule.") (internal quotation marks and citation omitted); *American Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

On top of that, the email explanation makes little sense. What administrative ease or convenience is there for counting in an inventory horses that should not count? Clearly the Service understood the relevant boundaries of Big Sage and Boles Meadow; otherwise, it could not have counted the wild horses in those areas when preparing the Wild Horse Inventory Reports. So if Big Sage and Boles Meadow were simply not part of the Wild Horse Territory, all the Service had to do was not include those wild horses in the Wild Horse Inventory Reports, or note that Big Sage and Boles Meadow were not part of the Wild Horse Territory. That was not hard to do; the Service repeatedly did it for other wild horses found outside the Wild Horse Territory. Convenience alone, then, does not explain why the Service not only monitored and managed wild horses in the Middle Section, but did so at the same time it

refused to count all of the other horses that it deemed to be outside of the Wild Horse Territory.[6]

In sum, the formal and published 1991 Forest Plan along with at least two decades of official Wild Horse Inventory Reports and the management activities they document together demonstrate that for twenty years the Service officially treated portions of the Middle Section as part of a single, contiguous Devil's Garden Wild Horse Territory. Given that longstanding practice, it is unsurprising that the Service's 2011 scoping letter for the revision at issue here treated the Middle Section as part of the Wild Horse Territory. While the agency tries to whistle past that factual graveyard, the established pattern of agency conduct and formalized positions cannot be evaded. The Service's failure even to acknowledge its past practice and formal policies regarding the Middle Section, let alone to explain its reversal of course in the 2013 decision, was arbitrary and capricious. *See, e.g.*, *Encino Motorcars*, 136 S. Ct. at 2126; *West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 12 (D.C. Cir. 2014) (vacating agency action because, *inter alia*, the agency "provided no reasoned explanation for how its decision comports with * * * prior agency practice"); *accord Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687, 690 (9th Cir. 2007) (invalidating an agency action because the agency "depart[ed] from its long-standing

---

[6] That is just the beginning of the e-mail's credibility problems. For instance, the email states that the retired employee "developed the Administrative map lumping the [Wild Horse] [T]erritory into one in the early 1990's." J.A. 767 (emphasis omitted). But the parties agree that the map in question actually originated in the 1980s. The email further asserts that, "[i]n the early 1980's Triangle was acquired through a land exchange," and "[b]ecause we had horses in the areas," he "lump[ed] them in with [the Wild Horse Territory]." J.A. 767. But there is no dispute that the Service acquired the Triangle lands in 1976.

practice" and "two-decade-old precedent without supplying a reasoned analysis for its change of course").

**2**

The Service also trots out would-be legal impediments to the Forest Plan's inclusion of the Middle Section in the Wild Horse Territory, insisting that it lacked the legal authority to incorporate the Middle Section and failed to comply with the procedural requirements for such a measure. But the Service's supposed failure to comply with all of the applicable laws for amending the boundaries of a Wild Horse Territory a quarter century ago does not mean that the expansion never happened. A failure to comply with the requirements of the Wild Horses Act or Administrative Procedure Act would not render the change to the territory void from its inception.

The Service's assumption that a purported past mistake would excuse the agency's current missteps is wrong. In administrative law, as elsewhere, two wrongs do not make a right. In addition, regardless of whether the Service's original decision was lawful, the Service never grappled with the 1991 Forest Plan's formal recognition of the unitary wild horse territory, the inventory reports, or its actions monitoring and regulating wild horses in the Middle Section for twenty years. Accordingly, whatever the Service's past transgressions, "we cannot condone the 'correction' of one error by the commitment of another." *Gray v. Mississippi*, 481 U.S. 648, 663 (1987); *see also Natural Res. Def. Council v. Thomas*, 805 F.2d 410, 435 (D.C. Cir. 1986).

**3**

Of course, the Service is free to change its policies going forward if doing so is reasonable. But the agency first must at least "display awareness that it *is* changing position" and

"show that there are good reasons for the new policy." *Fox Television*, 556 U.S. at 515. If instead "an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." *Greater Boston*, 444 F.2d at 852, *quoted in State Farm*, 463 U.S. at 57; *see also Encino Motorcars*, 136 S. Ct. at 2125 ("Agencies are free to change their existing policies so long as they provide a reasoned explanation for the change.").[7]

Accordingly, if the Service wishes now to formally revert to the 1975 territorial lines, it must acknowledge that it is actually changing course and explain its reasons for doing so. Whatever the cause of the initial incorporation of the Middle Section into the Wild Horse Territory, that action morphed into a multi-decade agency policy—formalized in part by the 1991 Forest Plan—that cannot be abandoned without some reasoned explanation. The Service's attempt to slam shut the barn door after the horse already bolted is not sufficient.

**B**

The Campaign next challenges the Service's determination that the removal of the Middle Section did not constitute a significant amendment under the Forest Management Act. The Forest Management Act provides that, if "amendment" of a Forest Plan "would result in a *significant change* in such [Forest Plan]," the Service must comply with heightened procedural requirements including public participation through a three-month study, public meetings,

---

[7] *See also Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (plurality opinion) ("Whatever the ground for the departure from prior norms, however, it must be clearly set forth [by the agency] so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.").

and compliance with the Multiple Use Sustained Yield Act of 1960, 16 U.S.C. §§ 528–531. *See* 16 U.S.C. § 1604(d), (e), (f)(4) (emphasis added).

In its Final Environmental Assessment, the Service concluded that amending the 1991 Forest Plan to redraw the Wild Horse Territory boundary was a "non-significant" action, and thus did not trigger the formal amendment process. The Service instead complied with the Act's less rigorous procedural requirements for alterations to a Forest Management Plan, 16 U.S.C. § 1604(d); *see id.* § 1604(f)(4).

The Campaign argues that excision of the Middle Section from the Wild Horse Territory made a "significant" change to the Forest Plan itself, and thus triggered the Forest Management Act's more formal and elaborate review process. That is not correct. While elimination of the Middle Section worked an important and consequential change in the Wild Horse Territory itself, the removal of those 23,000 acres had no material impact on the 1991 Forest Plan governing 1.6 million acres of the Modoc National Forest.

In interpreting the Forest Management Act, the Forest Service has explained that non-significant changes include "[a]djustments of management area boundaries or management prescriptions resulting from further on-site analysis when the adjustments do not cause significant changes in the multiple-use goals and objectives for long-term land and resource management." FOREST SERV., U.S. DEP'T OF AGRICULTURE, FOREST SERVICE MANUAL § 1926.51 (2015). By contrast, to constitute a "significant change" to a Forest Plan, the change would have to "significantly alter the long-term relationship between levels of multiple-use goods and services originally projected," "have an important effect on the entire [Forest Plan]," or "affect land and resources throughout a large portion

of the planning area during the planning period." *Id.* § 1926.52.[8]

Viewed against the comprehensive scope and operation of the 1991 Forest Plan, the Service's reworking of the Wild Horse Territory boundaries was not a significant change. The 1991 Forest Plan governs the entire Modoc National Forest. In formulating the plan, the Service balanced a panoply of considerations, including air quality, cultural resources, biodiversity, fire management, mineral leasing, pest control, range conditions, range management, livestock grazing, recreational uses, riparian resources, soil and water quality, timber clearance, and wildlife protection.

Within the Forest Plan, wild horse management is just one consideration, among a multitude of others, that fall within the broader consideration of the Plan's range-management sub-component. Other factors that the Service considers in developing a range management program are livestock management and diversity of ecological conditions. For instance, one objective of range management is "to produce desired expressions of" "herbaceous, shrub, and forest vegetation" through livestock grazing. J.A. 585. And even within the subject of wild horse management, the physical dimensions of the wild horse territory are just one element.

In other words, wild horse management is a factor of a factor of a factor that the Service considered when developing the Modoc Forest Plan. In addition, the Service's proposed reduction of the Wild Horse Territory by approximately 23,000

---

[8] The Forest Service Manual is a compendium of "legal authorities, responsibilities, delegations, and general instruction[s]," 36 C.F.R. § 216.2(a), that "establish[es] the general framework for the management and conduct of Forest Service programs," *id.* § 216.2(c).

acres represents at most a 1.5% change in the status of an area that will still remain within the federally managed Modoc National Forest. Even then, the Service will continue to superintend the remaining Wild Horse Territory, balancing wild horse management against livestock management and range biodiversity, and then balancing all of those range-management considerations against such concerns as air, soil, and water quality, and all of the other aspects of forest management.

When viewed in that context, the Service reasonably concluded that its proposed modification of the Wild Horse Territory's boundaries would likely have at most a slight effect on the "multiple-use" goals of the Forest Plan in the "long-term," and will not affect the "entire" Forest Plan or a "large portion" of the planning area.[9]

Finally, because we hold that the boundary change was not a "significant" change for purposes of the Forest Management Act, we need not address the Campaign's argument that NEPA requires an Environmental Assessment for significant changes under the Forest Management Act.

**C**

The Campaign's final argument arises under NEPA and the APA. Specifically, the Campaign argues that the Service's failure to prepare an Environmental Impact Statement addressing the boundary changes violated NEPA and was the product of arbitrary and capricious decisionmaking. We agree.

---

[9] The Campaign does not challenge the criteria set forth in the Forest Service Manual for a "significant" change. Accordingly, we need not determine what level of deference is properly afforded to the Service's interpretation of the Act. *Cf. Baptist Mem'l Hosp.-Golden Triangle v. Sebelius*, 566 F.3d 226, 228 (D.C. Cir. 2009).

In finding no significant environmental impact that would warrant an Environmental Impact Statement, the Service's NEPA analysis never came to grips with its departure from past practice, and thus never analyzed the potential environmental significance of its 2013 decision to contract the boundaries of the Wild Horse Territory by approximately ten percent.

Our "role in reviewing an agency's decision not to prepare an [Environmental Impact Statement] is a 'limited' one, 'designed primarily to ensure that no arguably significant consequences have been ignored.'" *Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (quoting *TOMAC v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006)). Our task in particular is to ensure that the Service, in finding no significant impact, (i) "accurately identified the relevant environmental concern," (ii) took a "hard look at the problem" in making its decision, (iii) has made "a convincing case for its finding of no significant impact," and (iv) "has shown that even if there is an impact of true significance, an [Environmental Impact Statement] is unnecessary because changes and safeguards in the project sufficiently reduce the impact to a minimum." *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011) (quoting *TOMAC*, 433 F.3d at 861); *see also Sierra Club v. Department of Transp.*, 753 F.2d 120, 127 (D.C. Cir. 1985).

The Service failed that task because its environmental analysis did not "*accurately* identif[y] the *relevant* environmental concern." *Van Antwerp*, 661 F.3d at 1154 (emphases added; internal quotation marks and citation omitted). Here, the relevant environmental concern was the effect of the boundary modification on the wild horse population in the Devil's Garden area. The Service not only failed to address that concern, it denied its very existence. The Service insisted that the redrawn boundary lines would have

"no effect" on the ground because it was only "correct[ing] a boundary established for administrative convenience." J.A. 372. That is, the only sense in which the Service "identified" the effect of the boundary modification on wild horses was by insisting that there *was* "no effect" and that nothing had ever really changed. That head-in-the-sand approach to past agency practice is the antithesis of NEPA's requirement that an agency's environmental analysis candidly confront the relevant environmental concerns.[10]

More to the point, because the Service actually managed wild horses within portions of the Middle Section for two decades as though they were within the Wild Horse Territory, the 2013 boundary change entailed far more than scratching out a few lines in the 1991 Forest Plan. Yet the Service refused to even consider the possibility of that broader, real-world impact. Thus, while the Service "identifie[d]" some effects on wild horses as an environmental concern, the Service did not forthrightly and "*accurately* identif[y] the *relevant* environmental concern"—the actual effects of the boundary modification on wild horses in the Devil's Garden area. *Van Antwerp*, 661 F.3d at 1154 (emphases added; internal quotation marks and citation omitted).

Likewise, the Service's Finding of No Significant Impact not only failed to take a "hard look" at the consequences of the boundary change, it averted its eyes altogether. *Van Antwerp*, 661 F.3d at 1154. As a result, the Service's analysis entirely omitted a "discussion of the relevant issues and opposing viewpoints," *Myersville*, 783 F.3d at 1325 (internal quotation

---

[10] In its August 2013 Environmental Assessment, the Service also referred to the inclusion of the Middle Section as an "administrative error." J.A. 264. Saying something was both done for "administrative convenience" and because of "an administrative error" is incoherent. The former is purposeful; the latter is not.

marks and citation omitted), because the Service refused even to entertain the opposing premise that the boundary modification did more than correct a few stray lines of text in the 1991 Forest Plan.  The Service's decision thus failed to "make a convincing case for its finding of no significant impact."  *Van Antwerp*, 661 F.3d at 1154 (internal quotation marks and citation omitted).

For those reasons, the Service's environmental analysis and Finding of No Significant Impact were arbitrary and capricious.[11]

\* \* \* \* \*

"Facts are stubborn things."[12]  But record facts are the grist of reasoned agency decisionmaking.  In this case, the Service brushed aside critical facts about its past treatment of and

---

[11]  The Campaign, in a footnote, also lobs an accusation of prejudgment and bad-faith at the Service, charging it with acting at the behest of the Farm Bureau.  The Campaign has not come close to meeting the high bar necessary to prove such allegations.  *See, e.g.*, *Air Transp. Ass'n of America, Inc. v. National Mediation Bd.*, 663 F.3d 476, 487–488 (D.C. Cir. 2011).  Regardless, its footnoted allegation is insufficient to preserve this argument on appeal.  *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("A footnote is no place to make a substantive legal argument on appeal; hiding an argument there and then articulating it in only a conclusory fashion results in forfeiture.").

[12]  *See* Statement of John Adams Made When Defending the Accused British Regulars at the Boston Massacre Trial, *quoted in* WILLIAM GORDON, THE HISTORY OF THE RISE, PROGRESS, AND ESTABLISHMENT, OF THE INDEPENDENCE OF THE UNITED STATES OF AMERICA:  INCLUDING AN ACCOUNT OF THE LATE WAR; AND OF THE THIRTEEN COLONIES, FROM THEIR ORIGIN TO THAT PERIOD, Vol. 1, p. 296 (1788).

official statements about the boundaries of the Devil's Garden Wild Horse Territory. As a result, the Service failed: (i) to acknowledge and adequately explain its change in course regarding the size of the Devil's Garden Wild Horse Territory and its management of wild horses within the Middle Section, and (ii) to consider or to adequately analyze the environmental consequences of those changes. Accordingly, we reverse the district court's grant of summary judgment in part, vacate the Service's exclusion of the Middle Section territory and the related Finding of No Significant Impact, and direct the district court to remand to the Service for further consideration consistent with this decision.

*So ordered.*